Francis M. Wikstrom (USB #3462)
Jim Butler (USB #4046)
Michael J. Malmquist (USB #5310)
J. Michael Bailey (USB #4965)
Elizabeth A. Schulte (USB #10624)
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 532-1234
ecf@parsonsbehle.com

Sean D. Reyes (USB #7969)
UTAH ATTORNEY GENERAL
Tyler R. Green (USB #10660)
Utah Solicitor General
Bridget K. Romano (USB #6979)
Civil Chief Deputy
Anthony Rampton (USB #2681)
Assistant Attorney General
Martin Bushman (USB #5594)
Assistant Attorney General
 350 N. State Street, Suite 230
Salt Lake City, UT  84114-2320
(801) 538-1000
uag@utah.gov

William G. Myers III
(*pro hac vice* application pending)
HOLLAND & HART, LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, ID 83701
(208) 342-5000
wmyers@hollandhart.com
*Counsel for Governor Gary R. Herbert*

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **GARY R. HERBERT**, in his official capacity as Governor of the State of Utah; the **STATE OF UTAH**, and the **STATE OF UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION**,<br><br>                   Plaintiffs,<br><br>v.<br><br>**S.M.R. JEWELL**, in her official capacity as Secretary of the United States Department of the Interior; **JANICE SCHNEIDER**, in her | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Civil Action No. 2:16-cv-00101-DAK<br><br>Judge Dale A. Kimball |

| | |
|---|---|
| official capacity as Assistant Secretary for Land and Minerals Management of the United States Department of the Interior; **NEIL KORNZE**, in his official capacity as the Director, Bureau of Land Management; **JENNA WHITLOCK**, in her official capacity as the Acting Utah State Director, Bureau of Land Management; and **UNITED STATES BUREAU OF LAND MANAGEMENT**; **THOMAS J. VILSACK**, in his official capacity as the Secretary of the United States Department of Agriculture; **THOMAS L. TIDWELL**, in his official capacity as the Chief, United States Forest Service; **NORA RASURE**,  in her official capacity as Regional Forester of the Intermountain Region of the United States Forest Service; and **UNITED STATES FOREST SERVICE**.<br><br>        Defendants. | |

For their complaint herein, Plaintiffs Gary R. Herbert, Governor of the State of Utah, the State of Utah and the State of Utah School of Institutional Trust Lands Administration allege as follows:

## INTRODUCTION

1.      The Greater Sage-grouse (*Centrocercus urophasianus*) ("Sage-grouse" or "GRSG") is a ground-dwelling, upland game bird found in parts of eleven western states.  Only about 6.1% of the current range-wide habitat and 6.8% of the species' range-wide population currently exist in limited areas of Utah.  The Sage-grouse's lifecycle depends on large swaths of sagebrush and related habitat.  For more than two decades, Plaintiffs have devoted significant resources to conserve Utah's Sage-grouse populations.  Since 1965, Utah has observed a slight

increase in its GRSG population.  This makes Utah the only western state that has not experienced a decline in GRSG populations during this time.

2.      More recently, the Federal government initiated range-wide GRSG conservation efforts on Federal lands.  At the invitation of Department of the Interior Secretary Ken Salazar, and in close coordination with Defendants, Governor Herbert acted to build upon Utah's earlier effective GRSG conservation work by further analyzing all habitat, populations, and opportunities to better conserve the Sage-grouse.  Governor Herbert approved a landmark conservation plan in early 2013 that Plaintiffs have been and continue to be implementing to enhance and expand earlier Sage-grouse conservation efforts.

3.      In 2015, notwithstanding numerous objections of Plaintiffs, Defendants unilaterally adopted an unprecedented management plan for millions of acres of Federal lands in Utah for the ostensible purpose of conserving Sage-grouse habitat.  These Federal land use plan amendments disregarded the hallmark of Federal land management – multiple use and sustained yield – and impose contradictory, and often unnecessary, restrictions on all activities in or near speculative habitat.

4.      These Federal decisions, and supporting environmental analyses, violate numerous Federal laws and regulations.  By this Complaint, Plaintiffs seek declaratory relief and an order enjoining implementation of the challenged final agency actions and associated land use plan amendments.

**JURISDICTION AND VENUE**

5.      This action seeks review of Defendants' land use decisions and analyses as contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, the Federal Land

Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1687, the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and other applicable Federal law.

6.      This Court has jurisdiction under 28 U.S.C. § 1331 to review Defendants' violations of NEPA, FLPMA, NFMA, and the APA.  This Court also can provide relief under 28 U.S.C. § 2201 and 5 U.S.C. §§ 553, 702 and 706 to remedy the violations.  Plaintiffs participated at each administrative stage of these agency actions, exhausted all available administrative remedies, and there exists an actual, justiciable controversy between Plaintiffs and Defendants. The challenged final agency actions and associated land use plan amendments are final and ripe for review by this Court.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e).  Defendants have offices in the District of Utah, a substantial part of events and omissions complained of occurred in this District, and the Federal property that is the subject of the action is situated in this District.

8.      Defendants are agencies or officials of the United States, which has waived sovereign immunity for the claims in this action under 5 U.S.C. § 702.

## PARTIES

### Plaintiffs

9.      Gary R. Herbert is the Governor of the State of Utah.  He brings this action in his official capacity.  The Utah Constitution vests in Governor Herbert the executive power of the state and requires him to see that the laws are faithfully executed.

10.      The State of Utah is a sovereign natural resources trustee.  The State is trustee and custodian of all wildlife, including Sage-grouse, within the State and has a statutory mandate to

4

"protect, propagate, manage, conserve, and distribute protected wildlife" throughout the State. Utah's regulation and management of Sage-grouse is significantly and immediately impaired by Defendants' decisions to restrict or close access to Federal lands within Sage-grouse habitat in Utah.  Utah has a sovereign interest in managing Sage-grouse to provide both conservation of the species and sustained use of GRSG habitat for the maximum benefit of the people of Utah.  The State, through the Utah Division of Wildlife Resources ("UDWR"), manages wildlife on a sustainable basis.  Utah's management of other natural resources, as well as its economic interest in resource development, are also adversely affected by Defendants' decisions.

11.    Utah participated in the administrative proceedings leading to Defendants' final agency actions and associated land use plan amendments by commenting on draft documents, protesting proposed plan amendments and environmental analysis, and advising Defendants of the numerous inconsistencies between Defendants' decisions and the State's plans to manage its natural resources, including Sage-grouse.

12.    The State of Utah School and Institutional Trust Lands Administration ("SITLA") is an independent state agency responsible for managing and developing Utah state trust lands for the exclusive benefit of Utah's schools and other beneficiaries.  SITLA-managed state trust lands include parcels granted by Congress at the time of statehood from which revenue is generated through oil, gas, and mineral leases; rents and royalties; real estate development and sales; and surface estate sales, leases and easements, to support state institutions including public schools, hospitals, teaching colleges, and universities.  As a result of Defendants' actions, and because State lands are intermingled with Federal lands, Utah trust lands have been designated within Priority

Habitat Management Areas (PHMAs) for Sage-grouse, and management and development options have been substantially impaired.

Defendants

13.     S.M.R. Jewell is the United States Secretary of the Interior and exercises supervisory control over the Bureau of Land Management ("BLM").  Defendant Jewell is sued in her official capacity.

14.     Janice Schneider is the Assistant Secretary for Land and Minerals Management of the Department of the Interior and duly executed each Record of Decision (ROD) constituting final Federal agency action for the BLM in this matter.  Defendant Schneider is sued in her official capacity.

15.     Neil Kornze is the Director of the BLM and duly executed each ROD.  BLM was responsible for developing and making decisions under Federal law that are challenged in this Complaint.  Defendant Kornze is sued in his official capacity.

16.     Jenna Whitlock is the Acting Utah State Director of the BLM who, together with Defendant Rasure, approved the environmental analysis and protest resolution process challenged in this Complaint.  Defendant Whitlock is sued in her official capacity.

17.     The Bureau of Land Management is an agency of the United States within the Department of Interior.

18.     Thomas J. Vilsack is the United States Secretary of Agriculture ("USDA") and exercises supervisory control over the United States Forest Service ("USFS").  Defendant Vilsack is sued in his official capacity.

19.     Thomas L. Tidwell is the Chief of the USFS.  The USFS was responsible for preparing and making decisions and analyses under Federal law on behalf of the Department of Agriculture that are challenged in this Complaint.  Defendant Tidwell is sued in his official capacity.

20.     Nora B. Rasure is the Regional Forester for the Intermountain Region of the USFS that includes Utah and Defendant Rasure duly executed the ROD, along with Leanne M. Marten. Defendant Rasure is sued in her official capacity.

21.     The USFS is an agency of the United States within the Department of Agriculture.

## STATUTORY BACKGROUND

*The National Environmental Policy Act ("NEPA")*

    *(a)     Generally*

22.     When BLM or USFS promulgates a land use plan or a plan amendment under FLPMA and/or NFMA, it must comply with the requirements of NEPA.  Agency regulations and guidance define the interplay between the planning process and NEPA compliance.

23.     NEPA requires Federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment" before undertaking the action.  NEPA's implementing regulations explain that the "human environment" includes "the natural and physical environment and the relationship of people with that environment."  NEPA requires that an agency must first prepare a draft EIS ("DEIS") for public review and comment.  The DEIS describes the purpose and need of the proposed action, the affected environment, a reasonable range of alternatives (including a "No

Action" alternative and the agency's preferred alternative), the expected environmental impacts for each alternative, and the consultation and coordination involved in developing the proposal.

24. NEPA's implementing regulations require a Federal agency preparing an EIS to solicit comments from affected State and local government entities.

25. After reviewing and considering the comments on the DEIS, the agency must prepare a final EIS ("FEIS") which includes an analysis of the substantive comments received and the agency's response to those comments, including any changes to the DEIS in response to comments.

26. NEPA's primary purpose is to ensure decision-makers and the public have sufficient information to assess the potential environmental effects of a proposed action and reasonable alternatives to those actions.  This analysis necessarily includes an assessment of both the beneficial and detrimental effects of the proposed action as well as each alternative.

27. NEPA's implementing regulations require an EIS to be written in plain language and follow a clear format so that the document is readily understandable by decision-makers and interested nonprofessional laypersons.

(b)      *Supplementation*

28. When the agency makes substantial changes in the proposed action from the DEIS to the FEIS that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns that bear on the proposed action or its effects, the agency is obligated to prepare a supplemental EIS and circulate that document for additional public review and comment.

*(c)     No-action Alternatives*

29.     Consideration of alternatives is considered to be the "heart" of the EIS process. Consideration of the "No-Action" alternative is required in every case, because it provides a benchmark against which the action alternatives are evaluated.  In the context of a land use plan amendment, the "No Action" alternative assumes that the proposed plan amendment is not adopted.

30.     To comply with NEPA and its implementing regulations, Defendants are required to rigorously explore all reasonable alternatives to the proposed action, including the "No-Action" alternative, in comparative form, and give each alternative substantial treatment in the FEIS.

*(d)     "Hard Look" at Scientific Information*

31.     In an FEIS, agencies must take a "hard look" at the environmental consequences of proposed actions based on public comment and the best available scientific information.

32.     NEPA's implementing regulations were promulgated by the Council on Environmental Quality ("CEQ").  The CEQ regulations provide that information for NEPA analyses must be of high quality and that accurate scientific analysis, using best available data, is essential to implementing NEPA.  A Federal agency fails to comply with NEPA when it relies on old data without showing that the data remain accurate.

33.     The CEQ regulations also prohibit agency predetermination by mandating that an agency must not commit resources that would prejudice selection of alternatives before making a final decision.  This prohibition is necessary so that the FEIS may serve as the means of assessing the environmental impacts of the proposed action, rather than as a means of retroactively justifying

decisions.  The FEIS must serve practically as an important contribution to the decision-making process and not be used to rationalize or justify decisions already made.

> (e)    *Special Expertise of Other Agencies*

34.    After issuance of a DEIS and before preparing an FEIS, NEPA requires the lead agencies to obtain comments from any Federal agency with special expertise on any anticipated environmental impact.

35.    When revising a resource management plan, the BLM must invite eligible Federal agencies to participate as cooperating agencies.

36.    BLM must provide other Federal agencies an opportunity to review, advise, and make suggestions on issues and topics that may affect or influence those agencies' programs.

37.    BLM "must whenever possible consult, coordinate, and cooperate with . . . Federal agencies concerning the environmental effects of any Federal action within the jurisdictions or related to the interests of these [agencies]."

> (f)    *Cumulative Impacts*

38.    An FEIS must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts.  A cumulative impact is the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions by anyone.

**The Federal Land Policy and Management Act ("FLPMA")**

> (a)    *Generally*

39.    FLPMA requires the Federal Government to manage public lands under principles of multiple use and sustained yield.  Section 103(c) of FLPMA defines "multiple use" as

10

"management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people" while providing a "combination of balanced and diverse resources uses . . . without permanent impairment of the productivity of the land and the quality of the environment."   Resource values include mineral resources such as oil and gas as well as renewables.  Section 103(h) of FLPMA defines "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use."

40.    Section 302(b) of FLPMA requires that in managing public lands, "the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."  The "unnecessary or undue degradation" standard, by its own terms, allows both reasonable and expected impacts consistent with BLM's multiple-use directive from Congress.

41.    Section 202(a) of FLPMA requires the Secretary of the Interior, with public involvement, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of public lands."  The Secretary promulgated regulations at 43 C.F.R. Subpart 1610 in response to her FLPMA § 202 obligations.

(b)    *Protest Resolution*

42.    The BLM's land management planning regulations allow any person who participated in the planning process and has an interest that may be adversely affected by the BLM's planning decisions to protest proposed planning decisions within 30 days after the notice of availability of the FEIS containing the proposed plan is published in the *Federal Register.*

11

43.     The BLM Director's decision on protests is the final decision of the Department of the Interior.

*(c)     Consistency with State Plans*

44.     Section 202(c)(9) of FLPMA mandates a substantive role for states and their governors in Federal land use planning efforts.  FLPMA requires the Secretary of the Interior to coordinate the agency's land use inventory, planning, and management activities with those of the states and local governments where the lands are located.

45.     Section 202(c) of FLPMA requires that the Federal Government make its land use plans consistent with state plans, policies, and programs, "to the maximum extent possible."  Not only must the Secretary consider and coordinate with the state on land use plans, but the Secretary is also required to "assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal government plans."

46.     To implement this directive and coordinate with the states, BLM land use planning regulations specify procedures for governors to be involved in the land use planning process, known as "Consistency Review."  Those procedures afford governors and states an opportunity to identify inconsistencies between the Federal and State plans, policies, and programs, and to provide written recommendations for changes to a Federal plan or plan amendment so that it may be consistent with a State plan.  The BLM land use planning regulations provide for direct review of a governor's concerns by a BLM State Director.  If a BLM State Director rejects the governor's recommendations, the governor may appeal that decision to the national BLM Director.  The BLM Director must then accept the governor's recommendations if the BLM Director determines these

recommendations demonstrate a "reasonable balance between the national interests and State interests" under FLPMA Section 202(c)(9).

(d)      State Primacy over Wildlife

47.      As sovereigns, States have historically retained the authority to manage wildlife within their borders.  Section 302(b) of FLPMA affirms that Congress did not usurp the States' primacy with respect to managing wildlife by expressly commanding that "nothing in this Act" enlarges or diminishes the State's responsibility for managing its wildlife.

48.      Plaintiffs maintain a lawful and independent interest in all the land and wildlife within the State of Utah.

49.      State authority over wildlife remains the comprehensive legal framework for wildlife management on Federal lands in the absence of preemptive Federal law.  There is no preemptive Federal law governing management of Sage-grouse on USFS or BLM Lands.

50.      Effective stewardship of wildlife requires cooperation among the States and the Federal government.  Department of the Interior regulations reaffirm the principal role of the States in resident wildlife management, especially where States have primary authority and responsibility.  Defendants retain the responsibility for management of certain wildlife resources, e.g., threatened and endangered species and migratory birds, but State jurisdiction is concurrent with Federal authority.

51.      Defendant Jewell's authority to manage BLM lands for wildlife conservation does not preempt State jurisdiction over wildlife.

52.      Section 103(e) of FLPMA defines public lands as on-shore, non-Native American lands owned by the United States and administered by the Secretary of the Interior through the

13

BLM.  FLPMA does not assign any role to the U.S. Fish and Wildlife Service ("FWS") in the administration of public lands.  Outside of National Refuge System lands, FWS is not authorized to administer fluid mineral leasing or operations on public lands.

(e)     *Areas of Critical Environmental Concern*

53.     FLPMA defines "areas of critical environmental concern" ("ACEC") as areas of public lands where special management attention is required to protect and prevent irreparable damage to important wildlife resources and for other purposes.  FLPMA requires that, when amending existing land use plans, the Secretary of the Interior must prioritize the designation and protection of ACECs.  FLPMA further requires that any Secretarial management decision under a land use plan that excludes a major use of the public lands such as mineral exploration and production on 100,000 acres or more must be reported by the Secretary to the U.S. House of Representatives and the U.S. Senate.  Congress may then, within 90 days, disapprove and terminate the exclusion.

54.     BLM's regulations require the agency to consider both the relevance of the wildlife resource and its importance above and beyond local significance and worth in designating ACECs. The BLM State Director must, at the time of approval of a draft land use plan amendment, publish a notice in the Federal Register listing each proposed ACEC specifying any resource use limitations and providing the public 60 days to comment on the proposal.  The approved land use plan amendment constitutes formal designation of the ACECs involved, including any limitations of the use of the public lands so designated.

***The National Forest Management Act ("NFMA")***

      *(a)    Generally*

55.    The NFMA provides for the development and maintenance of land management plans for use on units of the National Forest System.

56.    NFMA requires the Secretary of Agriculture, through the USFS, to manage the National Forest System lands consistent with the principles established under the Multiple Use and Sustained Yield Act of 1960 ("MUSYA").  NFMA requires that Federal land management consider both environmental and economic interests while also taking into account the Nation's needs for minerals.

57.    NFMA/ MUSYA define "multiple-use" as the "management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people."  "Sustained yield" is defined in NFMA/MUSYA as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land."

58.    MUSYA declares that "nothing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests."

59.    USFS regulations govern the development of resource management plan amendments, like those on National Forest System lands in this case.  Those regulations obligate the USFS to consider state and local plans and to identify opportunities to reduce or eliminate conflicts between State and Federal plans.

*(b)     Significant Forest Plan Amendments*

60.     Under Section 6(f)(4) of NFMA, which amended the Forest Rangeland Renewable Resources Planning Act of 1974, if a forest plan amendment would result in a "significant change" in a forest plan, there must be adequate public involvement. Section 6 of NFMA sets forth "Required Assurances" in developing forest plans, and requires the Secretary to assure that plans will "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the [MUSYA]."  This includes coordination of uses and yields for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.  The Secretary is also obligated to provide for public involvement in the development of these plan amendments.

61.     Section 5 of NFMA requires the Secretary to make plan amendments available to the public for at least three months before final adoption, during which period the Secretary must publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plan amendments.  Plan amendments are not effective until 30 days after completion of the public review process.

*(c)     Delegation of Review of Objections*

62.     NFMA requires the Secretary of Agriculture to promulgate regulations establishing procedures for States to comment on standards, criteria, and guidelines formulated for USFS programs.

63.     NFMA's implementing regulations require an independent USFS review and resolution of any objections before approval of plan amendments.  Decisions following a plan amendment may not become effective until the reviewing officer has responded in writing to all objections.

64.     Congress may permit a Federal agency to delegate its authority to a person within the agency; however, subdelegation outside of the agency is presumed to be improper absent an affirmative showing of congressional authorization.

65.     An agency improperly delegates its authority when it shifts to another agency the determination of whether a specific statutory requirement has been satisfied or where the agency abdicates its final reviewing authority.  An agency unlawfully subdelegates its authority when it gives a second agency unsupervised veto power over the delegating agency's administrative review process.

66.     USFS's regulations require an objector to submit a written document to a Reviewing Officer who has the delegated authority and responsibility to review objections.  The Reviewing Officer is a line official at the next higher administrative level above the line official who was responsible for the decision or, if at the same level, is different from the Responsible Official who had the authority and responsibility to oversee and approve the plan amendment.

67.     The Reviewing Officer issues a written response to the objections and can instruct the Responsible Officer regarding resolution of the objections.  The Reviewing Officer's decision is the final decision of the USDA on objections.

68.     USFS's regulations dispense with review by a Reviewing Officer of an objection to a plan amendment if another agency's administrative review process is used and is consistent with the USFS regulations.  The decision to dispense with the USFS objection review procedures and to subdelegate to another agency is not made by the superior Reviewing Officer but, instead, is made by the same official that was responsible for the decision that resulted in the objections.

69.   Through this regulatory process, the USFS has improperly granted the official responsible for forest plan amendments the ability to subdelegate to other Federal agencies the final decision of the USDA on objections to plan amendments.

70.   USFS authorizes and manages oil and gas leases on National Forest System lands pursuant to regulations, internal guidance, and agreements with the BLM.   None of these authorities grants FWS management authority over oil and gas leasing operations on National Forest System lands.

71.   The USFS Chief must determine the extent to which national forests may be devoted to Sage-grouse protection in combination with other uses and services and, in cooperation with the UDWR, the agency charged with protecting, propagating, managing, conserving, and distributing protected wildlife in the State of Utah.   Normally, the USFS works with UDWR to formulate plans to secure and maintain desirable populations of Sage-grouse, but FWS is not authorized to make determinations, formulate the plans, or make GRSG management determinations in the State of Utah.

### (d)   Zoological Areas

72.   NFMA requires that when revising land use plans for national forests, the USFS must provide for multiple uses including outdoor recreation.   The USFS's regulations state that recreation areas may be specially classified so as to set them apart for public recreation use.   Such classification formally closes the area to any use or occupancy inconsistent with the classification.

73.   The USFS's Forest Service Manual interprets FLPMA's authority providing for outdoor recreation to include the power to administratively designate and preserve recreation areas with zoological values.   "Zoological Areas" are defined as land units containing animal specimens,

groups or communities that are significant because of their occurrence, habitat, location, life history, ecology, rarity, or other features.

74.     The Secretary of Agriculture must designate Zoological Areas equal to or greater than 100,000 acres.  The Chief of the Forest Service must notify House and Senate committees of jurisdiction of any such pending Secretarial designation and any proposals to withdraw 5,000 acres or more of lands from application of mining laws.

***The Federal Advisory Committee Act ("FACA")***

75.     The FACA, 5 U.S.C. App 2, applies to any committee, panel, task force, or similar group that is established or utilized by one or more Federal agencies to obtain advice or recommendations for the agencies.  The FACA and NFMA and their implementing regulations require BLM and USFS to establish and utilize advisory committees that are transparent and balanced and not inappropriately influenced by the appointing agency.

76.     Among other procedural safeguards, FACA requires agencies to prepare and file a charter for the advisory committee, balance its membership, publish notice of its meetings, and prepare and maintain meeting minutes.

77.     Defendants are exempt from FACA if the meetings were held "exclusively" between Federal officials and elected State officers (or their designated employees with authority to act on their behalf).

***The National Defense Authorization Act ("NDAA")***

78.     The NDAA for fiscal year 2000 directed the Secretary of Defense to study the impacts upon military training, testing, and operational readiness of any proposed changes in BLM management of "Utah national defense lands."

79.     Utah national defense lands are defined as BLM lands in Utah that are located on or near the Utah Test and Training Range ("UTTR") or Dugway Proving Ground or beneath military operating areas, restricted areas, and airspace that make up the UTTR.

80.     The NDAA for fiscal year 2006 similarly requires consultation by the Department of the Interior with the Department of Defense on resource management plan amendments for Utah national defense lands.  The Department of Defense must prepare and transmit to the Department of the Interior an analysis of the impacts of the proposed revision within six months of a request from the Department of the Interior.

**The Surface Mining Control Regulatory Act ("SMCRA")**

81.     Under the SMCRA, the Secretary of the Department of the Interior is authorized to determine whether areas of Federal lands are unsuitable for all or certain types of surface coal mining operations.

82.     Under the regulations governing the implementation of SMCRA, land managed by BLM shall be deemed unsuitable for surface coal mining only if the BLM and the affected state agree.  This is known as an "unsuitability determination."

**The Federal Administrative Procedure Act ("APA")**

83.     The APA provides for judicial review of agency actions by persons "aggrieved" by such action.  The APA prescribes that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, . . . [or] without observance of procedure required by law."

84.     An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

**FACTUAL ALLEGATIONS**

85.     Defendants promulgated and approved certain decisions amending Federal land use plans and affecting millions of acres of Federal land in ten western states.  Plaintiffs challenge two Records of Decision published in September 2015 and affecting lands in Utah: (1) the BLM Record of Decision for the Great Basin Region ("BLM Great Basin ROD"), including the sub-region of Utah; and (2) the USFS Record of Decision ("USFS Great Basin ROD") for Utah (collectively, "Utah RODs").  The BLM Great Basin ROD included an Approved Resource Management Plan Amendment for Utah.   The USFS Great Basin ROD also included a Utah Plan Amendment (collectively, "Final Federal Plan Amendments").

86.     The Utah RODs are supported by a single FEIS that evaluated numerous BLM and USFS land use plan amendments impacting Utah.

87.     The Utah RODs, Final Federal Plan Amendments, and FEIS were prepared as part of a broad Federal land use planning effort affecting nearly 126 million acres of Federal land in the West for the ostensible purpose of avoiding the listing of the Sage-grouse under the Federal Endangered Species Act ("ESA").  Fourteen other FEISs, considering lands outside of Utah, were prepared at the same time.

*Utah's Management of Sage-grouse and Its Sage-grouse Conservation Plan*

88.     Utah has historically managed its Sage-grouse population primarily through the UDWR.  Responding to an apparent decline in population and loss of habitat over its entire range, the UDWR initiated a comprehensive Sage-grouse management plan in 2002 and a revision to that plan in 2009.  In connection with these efforts, Utah collected and reviewed a substantial amount of scientific information, data, and literature on Sage-grouse and its habitat needs in Utah.

89.     Because of geographical factors, Utah's Sage-grouse populations are found in isolated "islands" of habitat, rather than in a contiguous "sea of sagebrush," as Sage-grouse habitat has been described in Nevada and Wyoming.

90.     Plaintiffs have successfully managed Sage-grouse populations in Utah.  Based on the best available data collected by the UDWR (and submitted to the BLM and USFS), average male Sage-grouse attending courtship locations ("leks") in Utah has increased on a ten-year rolling average since 1965.

91.     In 2010, the FWS reviewed petitions seeking listing of the Sage-grouse and determined that the species warranted listing due to loss of habitat and inadequate regulatory mechanisms, but that a listing action was precluded at that time because of higher priority ESA species of concern ("2010 Finding").

92.     In December 2011, Secretary of the Interior Kenneth Salazar invited Governor Herbert and other western governors, consistent with the requirements of FLPMA, to develop State-based conservation plans and State-based regulatory mechanisms aimed at obviating the need to list Sage-grouse under the ESA.

93.     In reliance on the invitation by Secretary Salazar, the State of Utah assembled stakeholder-driven teams to review the local ecology, the factors affecting the viability of the species in each ecoregion, as well as the ongoing and potential human uses of the lands.  This effort was merged with Utah's successful and ongoing implementation of its Sage-grouse management plans.

94.     At the direction of Governor Herbert, and in good faith reliance on the Federal invitation to collaborate on Sage-grouse conservation, the State of Utah expended significant time and effort and millions of dollars to revise its existing Sage-grouse strategy and develop and adopt a Conservation Plan for Greater Sage-grouse in Utah in 2013 ("Utah Conservation Plan").

95.     The Utah Conservation Plan is based on extensive knowledge attained through years of scientific research and observation of Sage-grouse in Utah, as well as stakeholder input. Federal agencies participated in the Utah stakeholder discussions.  The Utah Conservation Plan is based on the best scientific data available, including 2012 habitat data and maps.

96.     The Utah Conservation Plan is premised on an "all-lands" program, which means it covers Federal, State, and private land within each of the unique Utah Sage-Grouse Management Areas identified in the plan.  The "all-lands" foundation is important because as much as 45% of the Sage-grouse habitat in Utah is privately owned.

97.     The focus of the Utah Conservation Plan is to create and maintain habitat useable for Sage-grouse.  Scientific information and experience have proven that useable habitat is the most important factor in Sage-grouse conservation in Utah.

98.     The Sage-Grouse Management Areas in the Utah Conservation Plan cover 90% of the available habitat and 94% of the Sage-grouse population in Utah.  The Utah Conservation Plan

addresses more than 7.4 million acres of Sage-grouse habitat at a management cost to the State of $5 million annually.

99.     The Utah Conservation Plan is consistent with applicable Federal law, policies and programs, and provides conservation of Sage-grouse and Sage-grouse habitat equivalent or superior to the Final Federal Plan Amendments.

***Federal Response to the 2010 Finding***

100.     As a result of the 2010 Finding, the Sage-grouse was designated a "candidate species" under the ESA.

101.     Soon after the Sage-grouse was placed on the Federal list of candidate species, the United States entered into a settlement agreement in the case of *In re Endangered Species Act Section 4 Deadline Litigation*, No. 10-377 MDL Dkt. No. 55 (D.D.C. Sept. 9, 2011), that established a schedule for making listing determinations for more than 250 candidate species nationwide, including Sage-grouse.  Plaintiffs were not parties to this litigation or the settlement agreement.  The government agreed to make a decision on the listing status of Sage-grouse by the end of September 2015, even though the species had received a listing priority number of 8 (on a scale of 1 to 12) which meant that threats to the species are moderate.

102.     After the 2010 Finding, western governors and the Director of the BLM created a Sage-grouse task force ("Task Force") to pursue a coordinated, multi-state, range-wide effort to conserve the Sage-grouse.  The Task Force enlisted the help of the FWS Director with the hope of preventing the need to list the Sage-grouse under the ESA.  In response to this request for assistance, the FWS created a Conservation Objectives Team ("COT"), which was composed of both state and FWS representatives.

103.    On March 22, 2013, FWS released the COT final report ("COT Report").  The COT Report provided a state-specific approach, recognizing the benefit of state-based management practices, monitoring, and implementation to account for state-specific issues.  The COT Report identified "priority areas of conservation," described as key habitats that are essential for Sage-grouse conservation.

104.    The COT Report's priority areas of conservation mirrored the Utah Sage-Grouse Management Areas.

### The EIS and Final Federal Plan Amendments

105.    Relying on Defendants' invitation to participate in collaborative conservation planning for Sage-grouse, Plaintiffs entered into a cooperating agency relationship under NEPA for preparation of the documentation required to amend the Defendant's existing land use plans.

106.    In August 2012, Utah provided the most recent scientific and mapping information on Sage-grouse habitat to BLM for use in the EIS process ("2012 data").

107.    The 2012 data explicitly refined and superseded previous data compiled by the State in 2009 and included significant differences in habitat classification.  Plaintiffs understood that this information would serve as the basis for the NEPA analysis.

108.    Rather than accepting the 2012 data as the best available scientific information on seasonal Sage-grouse habitat, BLM used obsolete 2009 maps in the EIS to determine Sage-grouse habitat in Utah.  Contrary to the requirements of NEPA, Defendants did not use the best available scientific information regarding Sage-grouse habitat in Utah in the EIS.

109.    Upon information and belief, the Utah BLM office is the only Federal office that failed to employ the relevant state's seasonal habitat data, and in its comments on the DEIS, Plaintiffs complained about the misuse of the 2009 data and the failure to use current data.

110.    On October 11, 2013, Defendants released the DEIS.  The DEIS purported to analyze a variation of the Utah Conservation Plan as an alternative, but did not include the Utah Conservation Plan or other Sage-grouse conservation measures taken by the State of Utah in the analysis of the "No-Action" alternative.

***New Information, Circumstances, or Changes in the Proposed Action***

111.    On May 29, 2015, the BLM and USFS released their proposed plan amendments and the FEIS.  The proposed plan amendments rejected the Utah Conservation Plan and adopted a Federal alternative that had been newly developed after the DEIS.

112.    The FEIS included numerous significant changes to the proposed land use plan that were not described or analyzed in the DEIS.  These included:

(a)    *Sagebrush Focal Areas*

113.    The FEIS presented the new concept of priority habitat areas, called "Sagebrush Focal Areas" ("SFAs"), which was an additional land management category under the amended land use plans that included significant additional land use restrictions, such as recommended withdrawals from the Mining Law of 1872, no surface occupancy for fluid mineral leasing, and prioritized permit re-evaluation for certain grazing permits.

114.    On information and belief, on or about October 1, 2014, Defendants participated in a meeting with the FWS described as a "leadership discussion."  As a result of the meeting, a

memorandum dated October 27, 2014 (October Memorandum), authored by the Director of the FWS was prepared for Defendants.

115.    The October Memorandum states that it is a response "to a request from the Bureau of Land Management (BLM) to identify a subset of priority habitat most vital to the species persistence, within which we recommend the strongest levels of protection."   The October Memorandum was accompanied by maps depicting GRSG "strongholds" that "have been noted and referenced by the conservation community as having the highest densities of species and other criteria important for the persistence of the species."

116.    The October Memorandum recommended some 16.5 million acres of SFAs to be accorded substantial restrictions on travel, grazing, and energy and mineral development.

117.    Defendants adopted the SFAs into their final decisions before they completed the required environmental analysis under NEPA.  On information and belief, Defendants were aware that FWS stipulated to make a listing determination on or before September 30, 2015, and that a lawful supplemental NEPA analysis for the land use plan amendments could not be completed before that deadline.  On further information and belief, Defendants were advised by the FWS that unless SFAs and other actions were included into the Final Federal Plan Amendments, FWS would not reach a determination that Sage-grouse did not warrant listing under the ESA.  As a result, Defendants irreversibly and irretrievably committed themselves to a desired plan of action and outcome under the Endangered Species Act and adopted a Final Federal Plan Amendment under FLPMA and NFMA that was not adequately evaluated under NEPA.

118. Defendants designated a total of 233,200 acres of land in Utah as SFAs. Designation of SFAs is significant because of the substantial additional land use restrictions that apply to the SFAs.

### (b)   Biologically Significant Units

119. The concept of Biologically Significant Units ("BSUs") was first introduced in Appendix E to the FEIS. BSUs are defined as geographical areas that contain relevant habitat used by Sage-grouse. Defendants used BSU's to impose new restrictions on human activity. The BSUs, along with project authorization scale, serve as the basis for a cap on human disturbance to habitat, set at 3%, within Sage-grouse Priority Habitat Management Areas ("PHMA") and controlling on subsequent land use planning actions. For the Utah Sub-region, a BSU is defined as the total PHMA acreage associated with a GRSG population area. At the BSU scale, the total PHMA acreage in a population area is the denominator portion of the disturbance percentage calculation. Defendants employ the BSU concept to, among others, prevent projects if the disturbance cap is exceeded through a formula as follows: "% Degradation Disturbance = (combined acres of the 12 degradation threats) ÷ (acres of all lands within PHMA in a BSU) x 100." This complex formula, linked to BSUs, was put forth for the first time in the FEIS.

### (c)   Lek Buffers

120. The Final Federal Plan Amendments for Utah adopted lek buffers which were not evaluated in the FEIS and were different from lek buffers applied to other states. The buffers were based on a report by the United States Geological Service ("USGS") in 2014.Defendants relied on the report to justify spatial lek-buffers and new oil and gas leasing restrictions first revealed in the FEIS.

(d)     *Priority Sage-Grouse Areas*

121.    USGS and FWS authored a study in 2015 on range-wide priority Sage-grouse areas and habitat connectivity strategies that were of particular relevance to Utah.  This study postdated the DEIS and FEIS.  It first appeared in the Great Basin ROD and was not evaluated in the FEIS.

(e)     *Net Conservation Gain*

122.    The FEIS included, for the first time, the imposition of a "net conservation gain" mitigation standard.  The FEIS and Final Federal Plan Amendments imposed a new requirement that the land management agencies "will require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation."

123.    The "net conservation gain" requirement was a significant change in the proposed action from what was discussed in the DEIS.  The new requirement was not subject to public review and comment.

124.    The "net conservation gain" requirement is not authorized by FLPMA or any other applicable law.  And the "net conservation gain" requirement is contrary to FLMPA's "multiple use" and "sustained yield" requirements.  BLM exceeded its statutory authority when it imposed the "net conservation gain" standard.

(f)     *Adaptive Management Triggers*

125.    The concept of adaptive management triggers was also added after the DEIS and was not subject to public review and comment.

(g)     *Other Post-DEIS information*

126.    Additional significant information that was included in the FEIS but not available for review and comment in the DEIS includes the Monitoring Framework Final Plan, the Disturbance Cap Guidance, a new fire management strategy, a new fire and invasive species assessment tool, and the Forest Service Biological Evaluation.

127.    Other significant, new information that came out after the DEIS and was not analyzed in a supplemental EIS but used by the FWS in its "not warranted" finding include the Natural Resource Conservation Service Sage-Grouse Initiative and seven years of additional population trend analysis from the Western Association of Fish and Wildlife Agencies and other scientists.

**Inadequacies of the FEIS**

128.    The FEIS fails to meet NEPA's implementing regulations' requirement of a document that is readable and understandable to the decision-maker and to the layperson potentially affected by the proposed action.

(a)     *No-Action Alternative*

129.    The FEIS fails to adequately describe or consider the "No Action" alternative, thus depriving decision-makers and the public of significant information on the relative impacts of the management alternatives.  The description of what would happen in the absence of land use plan amendments is minimal and the analysis is superficial.  The FEIS does not include the effects of implementation of Utah's Conservation Plan in the analysis of impacts of the "No Action" alternative, despite the fact that the plan had been adopted and implemented before the FEIS was prepared.

130.   The FEIS does not include a description or analysis of the 2012 data provided by the State of Utah or recent Sage-grouse population trend data.

(b)   *Lek Buffer Inconsistencies*

131.   In both general and priority habitat, the required lek buffer distance for infrastructure related to energy development in Utah is 3.1 miles from leks, as recommended in the 2014 USGS lek buffer study.

132.   In addition to the lack of public review and comment on the Utah lek buffer restrictions, Defendants arbitrarily and capriciously adopted widely disparate requirements on adjacent lands in Utah and Wyoming without any reason or justification.   On portions of two national forests in Wyoming the lek buffer distance in priority habitat is 0.6 miles and in general habitat is 0.25 miles.

133.   Because of the unexplained application of differing lek buffer distances in the two states, surface-occupancy for oil and gas development is prohibited in Utah but immediately across the state line, in the same Sage-grouse habitat, surface occupancy is allowed.

(c)   *Adaptive Management Inconsistencies*

134.   Defendants also adopted inconsistent adaptive management measures without any explanation or analysis.

135.   The Utah RODs and FEISs established adaptive management responses, called hard and soft triggers, to tighten conservation measures if future monitoring data show deteriorating habitat conditions, but there is no plan to loosen restrictions if monitoring shows improving habitat conditions ("reverse triggers").

136.    In contrast, the Idaho plan amendments include reverse triggers when Sage-grouse populations recover to, or are above, 2011 baseline levels.   In that event, land management restrictions would be lifted.

137.    Utah asked BLM and USFS to work with the State to identify reverse triggers, similar to those in the Idaho plan.  Utah was told that the analysis of the reverse triggers could not be included in the current NEPA analysis.  Governor Herbert protested this disparate treatment of Utah.  Consequently, Idaho was afforded relief from more stringent land use restrictions when conditions improved, but Utah, arbitrarily and capriciously, was not.

### (d)    Failure to Consult with USDA's Wildlife Services

138.    Predators can be a significant problem for Sage-grouse in Utah.   The Utah Conservation Plan found predation to be a key threat in many of the State's Sage-grouse Management Areas.  The Utah Conservation Plan further found that predation should be controlled and managed by the USDA, Animal and Plant Health Inspection Service ("APHIS") and its Wildlife Services unit in partnership with the State.  The Utah Conservation Plan sets out multiple actions to control predators.

139.    FWS's "not warranted" finding found that predation is the most commonly identified cause of direct mortality for Sage-grouse during all life stages.

140.    The FEIS included a discussion of the issue of predation but it did not reference APHIS or Wildlife Services in the text or accompanying references.  The BLM Final Federal Plan Amendments address predation minimally with some required design features that discourage raptors in priority habitat.

141.    The FEIS acknowledged Wildlife Service's expertise as one of three state and Federal agencies that BLM and USFS currently cooperate with in the management of predators. BLM and USFS allow Wildlife Services to control predators on the lands that they manage. Wildlife Services conducts predator research through its National Wildlife Research Center. Research is conducted in the Center's Utah Field Station located on the campus of Utah State University in Logan, Utah and includes expertise and behavioral ecology and nonlethal management tools.

142.    While acknowledging Wildlife Service's expertise and the issue of predation, and contrary to NEPA and its regulations, neither BLM nor USFS sought the special expertise of Wildlife Services and the agency was not asked to be a cooperating agency in the NEPA process.

                    (e)    *Defective Cumulative Effects Analysis*

143.    Collectively, Defendants' land use plan amendments for all Sage-grouse habitat affect more than 126 million acres across eleven western states.  In the FEIS for the Final Federal Plan Amendments in Utah, and in the other 14 FEISs, Defendants failed to acknowledge or evaluate the cumulative effects of the decisions, taken together with other past, present, and reasonably foreseeable actions that will interact with the land use plan amendments.  Failure to prepare such an analysis is a violation of NEPA.

                    (f)    *Defective Environmental Consequences Analysis*

144.    The FEIS fails to adequately assess or describe the beneficial and detrimental effects on GRSG populations resulting from the management actions under any of the alternatives. Such information is a fundamental requirement of NEPA, central to the decision on the land use plan amendments, and essential to a fair comparison among the alternatives.

*The National Technical Team- Violation of FACA*

145.    In August 2011, BLM formed and controlled a National Technical Team ("NTT"), which brought together resource specialists and scientists from BLM, other Federal agencies, and state fish and wildlife agencies.  The NTT was intended to serve as an independent, technical and science-based team to develop the "best available science" related to Sage-grouse management strategies that would be considered in the land use planning process.

146.    The full NTT met in Denver, Colorado, in August and September 2011 to develop a series of conservation measures to be considered and analyzed through the land use planning process.  On December 21, 2011, the NTT issued a report ("NTT Report").  Six days later, BLM issued an Instruction Memorandum to direct how BLM offices should consider the NTT Report in the land use planning process.

147.    BLM's Instruction Memorandum required BLM offices to consider and analyze the NTT recommendations and advice as part of the alternatives considered in the Sage-grouse land use planning effort.  One FEIS Alternative was based on the recommendations of the NTT Report. The Best Management Practices proposed in the NTT Report became the Required Design Features in the FEIS and ROD.

148.    The NTT Report was met with opposition from the states, the regulated community, and other fish and wildlife scientists as a "one-size-fits-all" approach that was not appropriate for the management of Sage-grouse whose habitat, population numbers, and threats vary from state to state.

149.    The ROD accepted many of the NTT Report recommendations, for example, limiting discrete anthropogenic disturbances to less than 3% within total priority Sage-grouse

habitat regardless of surface ownership, closing priority habitat to fluid mineral leasing, and recommending withdrawal of priority habitat from mineral entry.

150.    The NTT was a FACA committee but BLM did not comply with the requirements of FACA.  The NTT included at least one member who was not a Federal official or an elected state officer or that officer's designee.  The process was not transparent and the NTT was not balanced in its membership.  It was not independent of the BLM and was inappropriately influenced by the BLM.

151.    BLM did not issue a charter, publish notices of meetings, prepare and maintain minutes, or otherwise comply with FACA in its creation and use of the NTT.

*Governor Herbert's Protest*

152.    USFS waived its pre-decisional administrative review process, adopted BLM's protest process as a substitute, and instructed objectors to the proposed forest plan amendments to send their protests to BLM's protest coordinator.

153.    In accordance with applicable land use planning regulations implementing FLPMA, on June 29, 2015 Governor Herbert formally protested numerous aspects of BLM's and USFS's proposed land use plan amendments including misuse of State data, inadequate NEPA analysis, violation of the NDAA, violations of FLPMA, and violations of SMCRA.

154.    The BLM Director, "in agreement with the responsible official for the Forest Service," rendered the decision on protests and objections to Forest Service plan amendments and announced his decision through a Protest Resolution Report as the final decision of the Department of the Interior on each protest.

155.    BLM, and nominally USFS, denied Governor Herbert's objections.    Upon information and belief, the BLM Director improperly delegated management of the protests and responsibility for the protest decision to the Assistant Director for Renewable Resources and Planning.

156.    The USFS ROD states that the USFS Deputy Chief concluded that protests submitted to USFS could be resolved without significant changes.   Upon information and belief, the Deputy Chief was not designated by the USFS Chief to act as the Reviewing Officer.   The FEIS stated that the Responsible Official, Defendant Rasure, and not a Reviewing Officer, would render the decision on the protests.   This procedure conflicts with the requirements of NFMA.

***Governor Herbert's Consistency Review***

157.    On July 29, 2015, Governor Herbert filed an exhaustive 61-page Consistency Review with Defendants.

158.    In his Consistency Review, Governor Herbert asserted that the proposed plan amendments were inconsistent with the Utah Conservation Plan and failed to properly balance State-Federal interests by, among other things, adopting scientific research that was biased toward outcomes preferred by Defendants and rejecting the State's eleven specific Sage-Grouse Management Areas that were designed to best address GRSG conservation.   Governor Herbert also incorporated by reference other issues raised in his June 29, 2015 Protest.

159.    Additionally, the Governor noted the inconsistency wherein the proposed land management actions failed to consider the directive under Utah's Conservation Plan to avoid unreasonably interfering with or devaluing SITLA-managed trust land through restrictions on use or access.

160.    Defendants imposed a 3% disturbance cap in certain designated Sage-grouse habitat management areas and directed that the disturbance cap be calculated without regard to land ownership.  SITLA lands are included.  The present and future ability of Plaintiff SITLA to manage its trust lands is harmed by the 3% disturbance cap imposed on land use activity in these designated areas.

161.    Defendants' decisions violated FLPMA and BLM's consistency review regulations.

***Violation of the National Defense Authorization Act***

162.    Governor Herbert protested BLM's violations of the fiscal year 2000 NDAA.

163.    BLM denied the Governor's protest on the basis that its Final Federal Plan Amendments and FEIS did not amend any individual land use plans.

164.    The Great Basin ROD and Final Federal Plan Amendments amended four individual land use plans known as the Warm Springs, House Range, Pony Express, and Box Elder Resource Management Plans.

165.    Upon information and belief, the FEIS addresses wilderness characteristics or wilderness-management issues affecting the four resource management plans that are located within the Utah national defense land and that are amended by the ROD and Final Federal Plan Amendments.

166.    BLM acknowledged its duty under both fiscal year 2000 NDAA and fiscal year 2006 NDAA to consult with the Department of Defense and the Department of Defense's duty to report to Congress as a condition precedent to amendment of the four resource management plans located within Utah national defense lands.

167.     Upon information and belief, the Secretary of Defense has not submitted a report to Congress and has not conducted the study of the impacts on the Utah national defense lands resulting from BLM's ROD and FEIS.  The Department of Defense comments on the FEIS do not constitute the study or analysis required by NDAA.

168.     Upon information and belief, Defendant Jewell amended the Resource Management Plans affecting Utah national defense lands in the absence of the required Department of Defense report, study, and analysis.

### SMCRA and Coal Leasing

169.     Pursuant to its ROD, BLM will unilaterally determine the suitability of an area in a new lease application or lease modification application for surface coal mining under SMCRA's regulations based on Sage-grouse habitat designations.

170.     In his Consistency Review, Governor Herbert complained about the arbitrary change in classification of the Panguitch Population Area habitat, an area of potential surface coal mining, from "general habitat" in the DEIS to "priority habitat" in the FEIS.  This reclassification will preclude new surface coal mining.  Governor Herbert also protested the proposed land use plan amendments that preceded the State's Consistency Review.  The BLM state director denied Governor Herbert's Consistency Review recommendations.

171.     The FEIS describes the Panguitch Population Area and notes that the FWS's COT Report considered the local population to be "low risk."  The FEIS does not identify the specific reasons for the reclassification for the Panguitch area contrary to the COT Report and does not indicate any effort to reach a joint agreement with the State of Utah on the habitat designation.

172.     BLM's decision violates the coal leasing provisions of SMCRA.

***Deficiencies in the USFS's Final Federal Plan Amendments***

> (a)      *Significant Amendments*

173.     The USFS ROD concluded that its amendments to six-decades-old forest plans were not "significant" amendments.

174.     But FWS also stated that USFS's planning effort was "unprecedented in scope and scale, and represents a *significant* shift from management focused within administrative boundaries to managing at a landscape level."  FWS further described the USFS amendments as being "at the core of the [Forest Service's] National Sage-Grouse Conservation Strategy."

175.     The USFS plan amendments significantly altered multiple-use and sustained yield goals and objectives for long-term land and resource management because all future management authorizations and actions must conform to the USFS Final Plan.    USFS also committed to funding, implementation, monitoring, and adaptive management to ensure the long-term effectiveness of the Final Federal Plan Amendments.

176.     The USFS Final Federal Plan Amendments establish new management requirements for more than 800,000 acres in Utah.  The USFS further delineated SFAs to limit or eliminate any new surface disturbance.

177.     The changes imposed by the USFS Final Federal Plan Amendments are significant, not minor.  They incorporate management decisions as standards and guidelines.  Numerous, significant standards and guidelines affecting Utah are in the USFS ROD.

178.     The USFS Final Federal Plan Amendments will unreasonably impact non-Federal lands that contain as much as 45% of the Sage-grouse habitat in Utah.  The Governor's Consistency

Review explained how the USFS Final Plan amendments would conflict with State projects necessary to improve Sage-grouse habitat.

179.    The USFS's Final Federal Plan Amendments would significantly alter the long-term levels of multiple-use goods and services that were projected in the USFS's land use plans before these amendments.   This is because the Forest Service ROD imposes new, mandatory constraints on projects and activities.   These constraints include limits on human disturbance of more than 3% of priority habitat and other limits on land and realty decisions, land ownership, wind and solar development, habitat management, livestock grazing, fire management, recreation, roads, fluid minerals, coal mines, locatable minerals, and mineral materials.

180.    The USFS Final Federal Plan Amendments affect land and resources throughout a large portion of the planning area in Utah.   Total Sage-grouse habitat in national forests in Utah cover more than 1 million acres.   USFS violated NFMA and its own planning regulations when it adopted the Final Federal Plan Amendments.

181.    USFS violated NFMA and its own planning regulations when it determined that the Final Federal Plan Amendments were insignificant

(b)      *Restrictions on Anthro Mountain Oil and Gas Development*

182.    The Anthro Mountain area of Utah is a prospective oil and gas area that lacks manageable Sage-grouse habitat, in large part, because the ecological conditions necessary for the area to become a population growth center are not present; therefore, population augmentation practices will always be required for this area.

183.    The RODs include new restrictions for unleased Federal fluid minerals (oil and gas) in the Anthro Mountain area.   This area is subject to a "no-surface-occupancy" prohibition.   BLM

and USFS may grant an exception to the no-surface-occupancy prohibition only upon unanimous agreement among the State, the BLM or USFS, *and* the FWS.  Because of the topography of the Anthro Mountain area, the no-surface-occupancy requirement effectively eliminates resource development unless the exception is granted.  This new restriction on oil and gas development gives FWS management authority on the use of public land and over a state wildlife species and its habitat in the absence of any Federal listing or other legal authority.  The required FWS consent also subdelegates BLM and USFS management and planning of the surface lands above fluid energy resources on these public lands to FWS.

184.    Before issuing its Final Federal Plan Amendments and FEIS for Sage-grouse, USFS prepared an EIS in support of an oil and gas development decision dated February 2, 2012, and approved the South Unit Oil and Gas Development Project ("South Unit EIS") at Anthro Mountain.

185.    The South Unit EIS used the FWS and BLM-approved Density Disturbance Calculation Tool to determine existing and allowable levels of disturbance within Sage-grouse habitat within the project area.  The selected alternative met the cap on density applied to Anthro Mountain in order to minimize or eliminate impacts to the Anthro Mountain Sage-grouse population from the proposed project.

186.    USFS's Final Federal Plan Amendments impose excessive and conflicting additional standards, desired conditions, and guidelines for oil and gas development within the Anthro Mountain area outside the South Unit beyond those included for the existing South Unit EIS and decision.  The imposition of these additional standards is contrary to an agreement reached

between the State of Utah and the USFS concerning the application of the South Unit's standards to the Anthro Mountain area outside the South Unit.

187.    At the same time that USFS added excessive and conflicting Sage-grouse requirements to the South Unit, BLM was exempting the TransWest Express and Energy Gateway South transmission line rights-of-way in Utah from compliance with the conservation measures in the Great Basin ROD and Final Federal Plan Amendments.  The exemption was granted because BLM was then processing those right-of-way applications and the pending NEPA review was analyzing Sage-grouse mitigation measures.  Unlike the transmission line projects, the South Unit project NEPA and application are fully complete.

188.    To summarize, USFS completed NEPA analysis of the effects of the South Unit project in 2012 that considered Sage-grouse, then added excessive and conflicting analysis and requirements in its Final Federal Plan Amendments in 2015, and all the while BLM completely exempted other large infrastructure projects from its ROD and Final Federal Plan Amendments because these projects had ongoing, but incomplete NEPA analysis.  By these actions, USFS violated NFMA, FLPMA, NEPA and applicable regulations.

ACEC/Zoological Area Development

189.    Prior to issuing their Final Federal Plan Amendments, the BLM and USFS issued a draft land use plan amendment and DEIS.  The draft plan considered, under Alternative C, designation of 15 areas (2.2 million acres) as ACECs or Zoological Areas.  Thirteen of the areas covering 1.8 million acres would be designated as new ACECs.  Two of the areas covering 400,000 acres would be designated as new Zoological Areas.

190.    The draft plan/DEIS states that these areas provide protection and "focused" management of relevant values beyond that provided through general management of the same values elsewhere in the decision area.  These areas would be managed to "function as sagebrush reserves to conserve GRSG."   Management prescriptions for these areas included minimized human disturbance, withdrawal from mineral location, and removal of unneeded infrastructure.

191.    In response to a protest of the Final Federal Plan Amendments that no new ACECs or Zoological Areas were designated, the agencies referred the protester to a specific section of the Final Land Use Plan Amendments that described how SFAs "offer[ed] the highest level of protection for GRSG in the most valuable habitat."   That section of the Final Federal Plan Amendments announced the agencies' designation of SFAs "to further protect highly valuable habitat …."

192.    Defendants' designation of 233,200 acres of land in Utah as SFAs constitutes de facto designation of ACECs and Zoological Areas.  The Secretary of the Interior did not report to Congress her decision to exclude major uses of the public lands in these de facto ACECs and Zoological Areas.  Upon information and belief, the BLM State Director did not publish a notice in the Federal Register inviting public comment on the proposed ACEC designations.

193.    Neither the Secretary of Agriculture nor the Chief of the Forest Service notified Congress about designation of de facto Zoological Areas in the Final Federal Plan Amendments.

194.    Governor Herbert protested to the BLM and USFS the use of the SFA designations as equivalents for ACECs.  In his Consistency Review, the Governor requested an opportunity for public comment on the SFAs, similar to that required of ACEC designations.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Failure to Comply with the National Environmental Policy Act

195.     Plaintiffs reassert the allegations set forth in Paragraph 1 through and including Paragraph 194 above.

196.     Defendants violated NEPA by:

   a.     Failing to prepare a supplemental environmental impact statement under 40 C.F.R. § 1502.9(c)(1) after making substantial changes in the proposed action and in response to significant new information or circumstances;

   b.     Failing to adequately describe and consider the "No Action" Alternative;

   c.     Failing to take the required "hard look" at the environmental impacts of the proposed action, including the failure to adequately assess the effects on GRSG populations under any of the alternatives;

   d.     Failing to adequately consider the cumulative effects of the proposed action together with other reasonably foreseeable present and future actions;

   e.     Irreversibly and irretrievably committing to a desired outcome before it was adequately evaluated under NEPA;

   f.     Unreasonably relying on incorrect or outdated data;

   g.     Not obtaining the special expertise of Wildlife Services regarding an environmental impact related to the FEIS; and

   h.     Failing to prepare an EIS that meets NEPA's readability and understandability requirements.

197.     Such failures to abide by NEPA and its regulations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, or without observation of proceedings required by law. These failures, which have caused or threaten serious prejudice and injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

## SECOND CLAIM
### Failure to Comply with the Federal Land Policy Management Act

198.    Plaintiffs reassert the allegations set forth in Paragraph 1 through and including

Paragraph 197 above.

199.    Defendants violated FLPMA by:

a.      Failing to adhere to the consistency requirements of FLPMA 209(c) by either adopting the Utah Conservation Plan or resolving inconsistencies between the Federal and state plans;

b.      Illegally subdelegating fluid mineral land management authority to the FWS and in derogation of Utah's jurisdiction over its wildlife;

c.      Exceeding legal authority and departing from FLPMA's "multiple use" and "sustained yield" land management standard to impose instead a "net conservation gain" management standard on certain Federal land; and

d.      Failing to comply with FLPMA's requirements that lands be managed for multiple use and sustained yield.

e.      Failing to comply with FLPMA, its regulations, and BLM guidance in the designation of SFAs that are de facto ACECs.

200.    Such failures to abide by FLPMA and its regulations are arbitrary, capricious, an

abuse of discretion, and otherwise not in accordance with the law, or without observation of

proceedings required by law.  These failures, which have caused or threaten serious prejudice and

injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and

entitle Plaintiffs to the relief requested below.

## THIRD CLAIM
### Failure to Comply with the National Forest Management Act

201.    Plaintiffs reassert the allegations set forth in Paragraph 1 through and including

Paragraph 200 above.

202.    USFS violated NFMA by:

a.    Determining to classify its Final Federal Plan Amendments as non-significant under 16 U.S.C. § 1604(f)(4).

b.    Promulgating regulations allowing a USFS official to subdelegate USFS's NFMA duties for administrative review of plan objections to a subordinate officer at the Department of the Interior, the results of which have been to deprive Utah of the right to have its objections to the USFS's plan amendments heard and decided by the USFS in compliance with NFMA.

c.    Subdelegating its fluid mineral land management authority to the FWS.

203.   Such failures to abide by NFMA and its regulations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, or without observation of proceedings required by law.  These failures, which have caused or threaten serious prejudice and injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

**FOURTH CLAIM**
**Violation of Federal Advisory Committee Act and National Forest Management Act**

204.   Plaintiffs reassert the allegations set forth in Paragraph 1 through and including Paragraph 203 above.

205.   The failure by Defendants to comply with FACA and NFMA in the creation and use of the NTT and its report resulted in non-transparent and biased recommendations to Defendants that were directly incorporated into the FEIS and ROD.

206.   Such failures to abide by FACA and NFMA and their regulations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, or without observation of proceedings required by law.  These failures, which have caused or threaten serious prejudice and injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

**FIFTH CLAIM**
**Violation of the National Defense Authorization Act**

207.    Plaintiffs reassert the allegations set forth in Paragraph 1 through and including Paragraph 206 above.

208.    Defendant Jewell violated the NDAA for both FY 2000 and FY 2006 by amending the applicable land use management plans without the Department of Defense or the Department of the Interior having fulfilled the conditions precedent.

209.    Such failure to abide by NDAA and its regulations is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, or without observation of proceedings required by law.  These failures, which have caused or threaten serious prejudice and injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

**SIXTH CLAIM**
**Violation of SMCRA**

210.    Plaintiffs reassert the allegations set forth in Paragraph 1 through and including Paragraph 209 above.

211.    Defendant BLM violated SMCRA, 5 U.S.C. App. II, Sec. 2, 5, 9-14, and its implementing regulations, in unilaterally imposing habitat designations and not abiding by the regulatory requirements for suitability determinations.

212.    Such failure to abide by SMCRA and its regulations is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, or without observation of proceedings required by law.  These failures, which have caused or threaten serious prejudice and

injury to Utah's rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Defendants violated the APA in executing their respective Great Basin RODs and Final Federal Plan Amendments for Utah;

B.      Declare that the BLM and USFS Great Basin RODs and Final Federal Plan Amendments for Utah are contrary to Federal law, including, but not limited to, NEPA, FLPMA, and NFMA, or are otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or ultra vires;

C.      Declare USFS's subdelegation regulation at 36 C.F.R. 219.51(c) violative of NFMA;

D.      Enter an order setting aside, vacating and remanding the BLM and USFS Great Basin RODs, Final Federal Plan Amendments for Utah and the Utah FEIS;

E.      Enter an order precluding future use of the NTT Report in agency analysis or decision-making related to Sage-grouse;

F.      Permanently enjoin and restrain Defendants, their agents, employees, successors, and all persons acting in concert or participating with them from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the BLM and USFS Great Basin RODs and the Utah Final Federal Plan Amendments;

G.      Remand these actions to Defendants for further action as directed by the Court;

H.      Award attorneys' fees and costs incurred in pursuing this action; and

I.      Grant such other relief that the Court deems proper.

Dated this fourth day of February, 2016.

                              Respectfully submitted,

                              */s/ Francis M. Wikstrom*
                              Francis M. Wikstrom (USB #3462)
                              Jim Butler (USB # 4046)
                              Michael J. Malmquist (USB #5310)
                              J. Michael Bailey (USB #4965)
                              Elizabeth A. Schulte (USB #10624)
                              PARSONS BEHLE & LATIMER
                              201 S. Main Street, Suite 1800
                              Salt Lake City, UT 84111
                              (801) 532-1234
                              ecf@parsonsbehle.com

                              Sean D. Reyes (USB #7969)
                              UTAH ATTORNEY GENERAL
                              Tyler R. Green (USB #10660)
                              Utah Solicitor General
                              Bridget K. Romano (USB #6979)
                              Civil Chief Deputy
                              Anthony Rampton (USB #2681)
                              Assistant Attorney General
                              Martin Bushman (USB #5594)
                              Assistant Attorney General
                              350 N. State Street, Suite 230
                              Salt Lake City, UT  84114-2320
                              (801) 538-1000
                              uag@utah.gov

                              *Attorneys for Plaintiffs*

                              William G. Myers III
                              (*pro hac vice* application pending)
                              HOLLAND & HART, LLP
                              800 W. Main Street, Suite 1750
                              P.O. Box 2527
                              Boise, ID 83701
                              (208) 342-5000
                              wmyers@hollandhart.com
                              *Counsel for Governor Gary R. Herbert*

                                      49